UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARC ALEXANDER,<br>    *Petitioner*,<br><br>    *v.*<br><br>UNITED STATES OF AMERICA,<br>    *Respondent.* | Civil No. 3:19-cv-00545 (JBA)<br><br>September 19, 2022 |

**RULING ON PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE**

Petitioner Marc Alexander filed a motion to vacate, set aside or correct his sentence for conspiracy to commit mail fraud and wire fraud under 28 U.S.C. § 2255 on April 12, 2019. [Doc. #1]. Petitioner makes two ineffective assistance of counsel claims: counsel should not have allowed him to enter a guilty plea while impaired, and counsel should have sought a *Fatico* hearing at sentencing to determine Petitioner's loss liability under the Sentencing Guidelines. [Doc. # 12]. Petitioner asks the Court either to vacate his guilty plea or resentence him. (*Id.* at 22-23.) For the following reasons, Petitioner's motion is denied.

**I.    Legal Standard**

To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy both prongs of the test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must "(1) demonstrate[e] that his attorney's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms,' and (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." *United States v. Caracappa*, 614 F.3d 30, 46 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 688, 693 (1984)). Review under the first prong "must be highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . .

. [and] every effort [must] be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. To satisfy the second prong when alleging defects at sentencing, a petitioner must show a "reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence." *Lafler v. Cooper*, 566 U.S. 156, 164 (2012). Unlike the first prong, the second prong may be considered "with the benefit of hindsight." *Morgan v. United States*, No. 06 Civ. 1247, 2009 WL 1172849, at *5 (E.D.N.Y. May 1, 2009)  (citing *Lockhart v. Fretwell*, 506 U.S. 364, 371–73 (1993)).

## II.     Claim of Ineffective Assistance of Counsel at Guilty Plea Proceedings

### A.     Factual Background

The Court held a hearing on January 17, 2017, to afford petitioner the opportunity to plead guilty to conspiracy to commit mail fraud and wire fraud, and advised at the start that it would conduct questioning to ensure that it was a valid plea: "you know what rights you're giving up, that you're competent to enter a guilty plea, that you are doing it voluntarily and not under any duress, and that there's a factual basis for your guilty plea."[1] (3:16-cr-00073-JBA-1, [Doc. #240] at 3.) After Petitioner confirmed he understood the purpose of the hearing, the Court commenced questioning. (*Id.*) Petitioner responded that he had read and discussed the written plea agreement with his counsel and that he was satisfied with his counsel's advice and representation.  (*Id.* at 8-9, 14.)

When Petitioner began to appear unsteady after standing, the Court asked him if he needed to sit down, and Petitioner's counsel explained that Petitioner "hasn't eaten in several days because of various situations [at] Wyatt. And also, it's quite warm in here. So I think the combination of that is affecting his – his ability to stand

---

[1] Petitioner's counsel also affirmed that he had discussed the case with Petitioner, that in his opinion Petitioner understood the rights he was waiving, and that he was competent to plead guilty. (*Id.* at 7.).

up." (*Id.* at 25.) Petitioner's counsel offered to explain the "various reasons" for which Petitioner was "not eating the food" at the correctional facility Wyatt, and the Court held a sidebar to speak with counsel. (*Id.* at 25-26.) After the side bar, the Court paused the proceeding so that Mr. Alexander could eat, noting that "although he certainly appears fully attentive to what is going on here, one cannot be too careful." (*Id.* at 32.)

After the recess, the Court and Petitioner's counsel had the following discussion on the record:

> THE COURT: All right, please be seated, counsel. We are continuing the hearing in US versus Marc Alexander. Are you feeling refreshed, Mr. Alexander?
>
> THE DEFENDANT: Yes, ma'am, thank you.
>
> MR. PAETZOLD: Your Honor, just for the record, while Mrs. Alexander's change of plea was taking place, I met with Mr. Alexander to make sure that one, he was -- he received the meal, which he did. And number two, that he was coherent and understood what was happening. And so I conducted a number of inquiries of Mr. Alexander to see whether he was aware of what was taking place here prior to him kind of passing out. And also –
>
> THE COURT: I wouldn't call it passing out. I would call it stumbling.
>
> MR. PAETZOLD: Stumbling, all right. I didn't -- I just saw him going to the side. Nonetheless, he indicates to me that he is aware of what is taking place, that this is a change of plea, and that he intends to continue with the change of plea. And I encourage the Court to ask any further questions.

(*Id.* at 32-33.) Petitioner then affirmed that he was in a more comfortable state, and that he was ready to proceed. (*Id.* at 33.)

In a declaration by Petitioner's counsel, William Paetzold, he states that "[m]y understanding is that [Petitioner] had not eaten for at least a few days prior to his appearance in court for the guilty plea." [Doc. # 12-1] at 2-3. He recites that he and Petitioner had discussed a guilty plea prior to his change of plea hearing, including

questions about the number of cars that the government sought to hold him accountable for under the Sentencing Guidelines upon a guilty plea. (*Id.* at 3.) Attorney Paetzold "believed that [Petitioner] was prepared to proceed as he began answering the Court's questions as part of the plea allocution." (*Id.*) During the allocution, Attorney Paetzold states that "Mr. Alexander whispered to me that he was feeling a little nauseous and dizzy. It was warm in the courtroom. I recall that Mr. Alexander's breath smelled very bad. He stumbled at some point as if about to faint." (*Id.*) Petitioner alleges that his bad breath was a symptom of ketosis, "a condition caused by inadequate intake of carbohydrates."[2] (Pet'r's Mem. at 7.) Mr. Paetzold states that although he advised the Court that Mr. Alexander understood what was going on in court "based on my inquiries of Mr. Alexander," he had "no independent basis to say that Mr. Alexander was in adequate condition to proceed or able to evaluate and attest to his condition." (*Id.*)

Petitioner also submitted a declaration dated June 2, 2021 stating that he had not been "up to something as important as agreeing to plead guilty" based on his condition at the time of the change of plea hearing and that he still "had questions about the government's view of loss, the number of cars for which I could be properly held accountable, whether or not it was best to plead guilty with a plea agreement, among other things," but that he "did not resolve those questions to [his] satisfaction" before pleading guilty. [Doc. # 12-2] at 2-3.)

B.    **Discussion**

---

[2] According to Petitioner's submissions, ketosis is not always severe enough to be considered an impairment, as there are diets that specifically seek to induce a state of ketosis as part of a weight loss plan. (*See* Pet'r's Mem. at 7, citing "10 Signs and Symptoms that You're Into Ketosis," Healthline.com, https://www.healthline.com/nutrition/10-signs-and-symptoms-of-ketosis.)

Petitioner argues that his counsel erred in not requesting a rescheduling of his guilty plea because counsel knew Petitioner had not eaten for some period of days and was exhibiting visible symptoms of unwellness. (Pet'r's Mem at 21-22.) He claims that there was a "reasonable probability" that he would not have entered the plea, or at least the particular plea as presented, if counsel "properly requested an adjournment." (*Id.*) According to Petitioner, counsel should have "at least" requested that the Court re-start the Rule 11(b) questioning from the beginning after Petitioner was provided the chance to eat. (*Id.*) In Petitioner's view, neither the sandwich provided to relieve Petitioner's hunger nor his "expressed sense of his ability" to proceed were sufficient to satisfy the requirements of a voluntary and intelligent plea because "[t]he fact that a defendant seems competent when answering the judge's questions at the plea hearing should not be conclusive." (*Id.* at 22) (citing *United States v. Hardimon,* 70 F.3d 940, 943 (7th Cir. 2012)).

Respondent argues that Petitioner's claim is barred by the mandate rule, prohibiting "'re-litigation of issues already decided on direct appeal.'" (Response [Doc. # 14] at 14) (citing *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010)). Specifically, Respondent references Petitioner's unsuccessful challenge to the validity of his guilty plea under these circumstances in the Second Circuit, arguing that since the Second Circuit has rejected it, it could not be reconsidered without running afoul of the Second Circuit's decision in *United States v. Perez,* which explicitly applied the mandate rule to a § 2255 motion. (Response at 14) (citing 129 F.3d 255, 260 (2d Cir. 1997)). Respondent also argues that the claim fails on the merits under the *Strickland* standard. (*Id.*) Respondent points to counsel's steps to prepare his client for the change of plea proceeding, his communication with his client during it, ensuring his client ate during recess, speaking to him about resuming the proceeding, and affirming that his client was aware of what was taking place. (*Id.* at 22.) Further,

Respondent argues, there is no prejudice because Petitioner does not claim actual innocence, only dissatisfaction with the sentence he received as a result of the plea. (*Id.*) Finally, Respondent argues that Petitioner's affidavit only reflects what is already in the record, rather than presenting the court with any new factual information. (*Id.*)

In reply, Petitioner maintains that the prejudice caused was twofold: he still had lingering questions about both the implications of his plea and his possible sentence that might have been resolved if his plea hearing had been postponed, and he might have then narrowed the terms of his plea to reduce his possible sentence. The remedy he seeks is to "assure that his guilty plea and sentence serve to hold him accountable only for the loss for which he is truly responsible," not to enter a plea of actual innocence. (Reply at 3.)

The mandate rule "bars re-litigation of issues already decided on direct appeal," whether "expressly decided by the appellate court" or "impliedly resolved by the appellate court's mandate." *Yick Man Mui*, 614 F.3d at 53 (2d Cir. 2010). An appellate court implicitly rejects an ineffective assistance of counsel claim, later brought in a § 2255 petition, if the underlying facts and arguments were considered and rejected on appeal. *See id.*

The Second Circuit considered and rejected Petitioner's argument that his guilty plea had not been knowing and voluntary. *United States v. Harris*, 813 F. App'x 710, 715 (2d Cir. 2020) (summary order). It held that "the district court did not plainly err in determining that Marc Alexander was competent to enter a knowing, intelligent, and voluntary plea" because it did so after "determining that Marc Alexander was competent to change his plea, then taking concrete steps to address concerns about his mental and physical state that arose in the middle of the proceeding and conducting an inquiry to ensure the effectiveness of those steps." (*Id.*

at 3-4.) The Second Circuit's opinion precludes this Court from finding otherwise and, by implication, also requires a finding that counsel's performance was not deficient. If the plea proceeding was not deficient, then there was no need to reschedule it or restart the Rule 11 colloquy, making counsel's decision not to request either course of action a reasonable one.

Petitioner maintains without elaboration that a challenge to a guilty plea is distinguishable from an ineffective assistance of counsel claim for purposes of the mandate rule under *Perez*. (Reply [Doc. # 15] at 2.) However, litigants cannot evade the binding nature of an appellate ruling by merely repackaging a substantive claim as ineffective assistance of counsel; if a claim is "premised on the same facts and rest[s] on the same legal ground" as one brought on direct appeal, *United States v. Pitcher*, 559 F.3d 120, 124 (2d Cir. 2009), it will be barred. *See Jones v. United States*, 543 F. App'x 67, 71 (2d Cir. 2013) (finding that where the Second Circuit affirmed the district court's refusal to instruct on multiple conspiracies to the jury, petitioner's claim that counsel was ineffective in failing to request the same instruction "fare[s] no better when reframed as an ineffective assistance of counsel claim.") Like the petitioner in *Jones,* Petitioner's attempt to reframe his guilty plea challenge as an ineffective assistance of counsel fares no better than his original unsuccessful arguments before the Second Circuit.[3]

---

[3] In fact, Petitioner does not cite authorities that address the responsibilities and duties of counsel, but primarily on cases that explain a *court's* responsibility during a Rule 11(b) colloquy. (*See* Petition at 21-22). For example, when Petitioner cites to *Hardimon,* 70 F.3d 943, the quoted portion states that "A *judge* is required to investigate the defendant's mental state if there are indications at the plea hearing or later of an impairment that made him incompetent to plead." (*Id.*) (emphasis added). Petitioner reiterates that "[a] *district court's* failure to follow [Rule 11(b)'s] requirements requires that a reviewing court 'examine critically even slight procedural deficiencies to ensure that the defendant's guilty plea was a voluntary and intelligent choice.'" (*Id.*) (citing *United States v. Rodriguez,* 725 F.3d 271, 277 n.3 (2d Cir. 2013)) (emphasis added).

The declaration of Attorney Paetzold largely confirms what is already in the record: that Mr. Alexander was not feeling well after several days without food; that at one point he stumbled in court, which resulted in a temporary recess of the proceedings; and that counsel conducted an inquiry to determine Petitioner's competency to understand what had transpired up to that point and to proceed. (*See* Exhibit 1.) Petitioner's own declaration provides additional insight on his own view of his competency that day but adduces no new facts warranting a different outcome from the Second Circuit's conclusion that Petitioner entered a valid guilty plea while represented by his attorney. (*See* Exhibit 2.)

The Court DENIES Petitioner's request to vacate his guilty plea.

### III. Claimed Ineffective Assistance of Counsel for Failure to Request a *Fatico* Hearing on Loss Calculation

#### A. Factual Background

Petitioner's plea agreement noted disagreement about "the applicability of other sections of the Guidelines," including the amount of loss under Count 14, which was the title-washing scheme. (3:16-cr-00073-JBA-1 [Doc. # 166] at 4.)[4] In Petitioner's sentencing memorandum, counsel disputed several of the loss calculations in the Presentence Report for the title washing scheme, pointing out instances where the loss figure wrongly included penalties in violation of U.S.S.G. § 2B1.1, Application Note 3(D)(i), and presenting a proposed figure of $477,736.84 prior to the deduction of any credits under U.S.S.G. § 2B1.1, Application 3(E). (3:16-cr-00073-JBA-1, [Doc. # 191].) No *Fatico* hearing was requested.

---

[4] The Presentence Investigation Report noted that the Government believed the offense level for Count 14 would be increased by fourteen levels "for a loss amount exceeding $550,000 dollars but not more than $1,500,000. (3:16-cr-00073-JBA-1, Presentence Investigation Report ("PSR") [Doc. # 188] at 3.)

Instead, both counsel for Petitioner and for the Government made arguments at sentencing as to the proper method of calculation for intended loss, as well as the resulting amount. (3:16-cr-00073-JBA-1, Sent'g Tr. at 6.) Defendant's counsel disagreed that "all of [the vehicles in the PSR] should be assessed towards Mr. Alexander," noting that the proposed figures did not necessarily take into account "exclusions from loss," and contending "that the loss should be a 12-level increase, as opposed to a 14-level increase." (*Id.* at 8-9.) Counsel argued that "there were only six cars where there was actual title washing that had taken place," and that given the complexity of the subsequent purchases, repossessions, and seizures, the correct way to proceed was to use a "reasonable estimate" to conclude that the offense level would be more than $250,000, but less than $550,000. (*Id.* at 12-13.) After hearing from both sides, the Court found:

> The Court . . . with respect to the amount of intended loss on Count 1 [the postal order fraud], [] is persuaded that he is responsible for the full [$]313,000. Even if we . . . went to Count 14 [the title washing scheme], which the defendant argues is too complex and therefore the Court should estimate, I look at the government's spreadsheet of the amount financed, [$]1078,000; the amount owed, [$]840 – almost [$]841,000. Take a percentage of any of those, and we are well into the [$]550 category, more than [$]550. And even the defendant, using the figure of [$]477,700, which he says does not embrace all of the credit and fees and so forth that should be taken into account, even if you took 50 percent of that, which has got to be far – a generous exemption for that which should not be included, [you] are still in the [$]550,000 plus category. So it seems to me any way that you slice and dice it, the intended loss from these two schemes is – gets a 14-level enhancement.

(*Id.* at 68.)

Petitioner was sentenced to 96 months imprisonment and on July 25, 2018, restitution was ordered in the amount of $624,308.92 to be paid by Marc Alexander and his wife, Rachael Alexander. The order included a schedule breaking down each entity to whom restitution had to be paid. (3:16-cr-00073-JBA-1 [Doc. # 386].)

Petitioner appealed his guilty plea, sentence, and restitution, but raised the lack of a *Fatico* hearing only as grounds for a new restitution proceeding, rather than for a resentencing. The Court has now entered a new order on restitution in accordance with the Second Circuit's remand. (3:16-cr-00073-JBA-1 [Doc. # 485].)

**B.    Discussion**

Because his co-defendant Rachael Alexander challenged the government's evidence as to the amount of intended loss at her own *Fatico* hearing and reduced the scope of the title-washed cars from twenty-nine cars to eleven, Petitioner therefore reasons that his own counsel was ineffective in not also requesting a chance to reduce the scope of his loss. (Petition at 20). Because his counsel argued instead that the calculation of loss "had too many moving parts to estimate," Petitioner alleges his performance "fell below an objective standard of reasonableness under prevailing professional norms." (Petition at 20). A *Fatico* hearing "would have limited Petitioner's loss to just the cars for which he was truly accountable," which he maintains only encompasses the seven cars he knew were part of the title fraud, with an associated loss value of only $205,230.67.  (*Id.* at 12-13, 20.) When combined with the $313,570 postal order fraud loss, Petitioner contends the total loss would have been $528,800.67, which would have resulted in a 12-point increase to the Guidelines base level instead of 14. (*Id.* at 12-13) At a resentencing, Petitioner argues that he would be resentenced under the Guidelines to 63-78 months instead of 77-96. (*Id.* at 23.)[5]

---

[5] Respondent mistakenly maintains that Petitioner cannot establish his ineffective assistance of counsel claim because the Court gave him the opportunity to have a *Fatico* hearing after the direct appeal and remand on issues of restitution. (Response at 16.) The opportunity for a *Fatico* hearing Petitioner was provided was limited to restitution by the Second Circuit's opinion and did not extend to the loss calculation Petitioner now contests.

"The purpose of a *Fatico* hearing is to permit 'the prosecution and the defense [to] introduce evidence relating to the appropriate sentence,'" including loss. *Naranjo v. United States*, No. 13-CR-351 (JSR), 2021 WL 1063442, at *12 (S.D.N.Y. Feb. 26, 2021), *report and recommendation adopted*, No. 13-CR-351 (JSR), 2021 WL 1317232 (S.D.N.Y. Apr. 8, 2021) (quoting *United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991)). Defense counsel "may properly decide to forego a *Fatico* hearing as a matter of strategy, and [the Second Circuit] presume[s] that such a strategy is sound absent a strong showing to the contrary," *Flores-Mendez v. United States,* No. 13-CR-0031 (KBF), 2018 WL 357311, at *2 (S.D.N.Y. Jan. 10, 2018) (citing *United States v. Santiago,* 330 Fed. App'x 234, 238–39 (2d Cir. 2009) (internal quotations omitted), especially when there is a strong chance the government will present "an enormous amount of damaging evidence regarding the seriousness and scope" of a crime or conspiracy. *See Schwamborn v. United States*, 492 F. Supp. 2d 155, 163 (E.D.N.Y.), *adhered to in part on reconsideration*, 507 F. Supp. 2d 229 (E.D.N.Y. 2007) (citing *Clymore v. United States,* 164 F.3d 617, 1998 WL 681281, at *2 (2d Cir. February 5, 1998) (summary order*).

Although the number of title-washed cars was ultimately reduced from the government's proposed twenty-nine cars to eleven after Rachael's *Fatico* hearing, counsel's conduct must be evaluated without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. At the time of his sentencing, the government alleged Petitioner was responsible for losses associated with twenty-nine cars for a total amount owed of $841,000; it was reasonable strategy for Petitioner's counsel to conclude at the time that the risk of a *Fatico* hearing that Petitioner would be sentenced on even more than $550,000 outweighed the possibility that he could establish it was less. (3:16-cr-00073-JBA-1, Sent'g Tr. at 68.)

Petitioner's claim fails on the second *Strickland* prong as well, because he cannot show that the failure to request a *Fatico* hearing caused him prejudice. *See Strickland*, 466 U.S. at 697. While Petitioner points to the results of Rachael's *Fatico* hearing as evidence that he was prejudiced, Rachael received the same 14-point enhancement for losses over $550,000 as Petitioner. (3:16-cr-73-2 (JBA), Sent'g Tr. at 6.) To overcome this hurdle, Petitioner advances the convoluted argument that he would have been successful at *his* hearing because based on the facts adduced at *Rachael's* hearing, he is liable for only seven of the eleven cars that the Court found were part of the title-washing scheme. Taken together with his second argument— that the intended loss value for each car should be reduced by its fair market value— Petitioner claims there is a reasonable probability the Court would have found his loss amount to be less than $550,000.

At Rachael's hearing, the Government presented evidence on both intended loss and on restitution; the distinction between the two figures was that restitution amount was reduced to account for any vehicles that were repossessed and resold, thus recouping some of the lost value. (3:16-cr-00073-JBA-2, *Fatico* Day 1 Tr. [Doc. # 406] at 79.) At the end of the hearing, the Government concluded the intended loss for the title-washed cars was $548.237.97, and that restitution value was $310,738.92. (3:16-cr-00073-JBA-2, *Fatico* Day 2 Tr. [Doc. # 407] at 117.) In the Court's recent order on Marc Alexander's restitution, the same monetary losses associated with the eleven cars Rachael Alexander was held liable for were found reasonably foreseeable to Petitioner as well, rejecting his argument that he should be responsible for less restitution than Rachael Alexander. (*See* 3:16-cr-00073-JBA-2 [Doc. # 485].)

Like restitution, if a loss is a reasonably foreseeable consequence of the conspiracy, then a defendant can properly be sentenced based on that loss even

without proof of direct knowledge or participation. *See United States v. Leslie*, 658 F.3d 140, 144 (2d Cir. 2011) (holding that the defendant could be sentenced based on losses occurring as a result of the conspiracy even after he was incarcerated because he was the person who devised the fraud scheme, executed it, and taught others to use it, and had never withdrawn from it.). The Court is unpersuaded that Petitioner should be held responsible for less loss than Rachael based on their roles in the conspiracy given that "Rachael and Petitioner were identically-charged and each independently qualified for aggravating role adjustments under U.S.S.G. [§] 3B1.1," (Pet'r's Mem. at 13.), and the Court rejected an identical argument in its recent order on his restitution. (*See* 3:16-cr-00073-JBA-1 [Doc. # 485].) Petitioner thus has not demonstrated a "reasonable probability" that he would have been sentenced on less than eleven cars for a total intended loss value less than $550,000. *Lafler*, 566 U.S. at 164.

Petitioner also argues that under Application Note 3(E)(ii), he would have established at a *Fatico* hearing that the amount of loss for each car should be reduced by the fair market value of the vehicle. However, Application Note 3(E)(ii) states that loss should be reduced "[i]n a case involving collateral pledged or otherwise provided by the defendant [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." As the Court explained in its recent restitution order, however, the amount recovered from the "disposition of collateral" was taken into consideration at the *Fatico* hearing when calculating restitution, and is thus the same as the value of intended loss minus credits for disposition: $ 310,738.92, which when combined with the amount of the postal order fraud [loss], still exceeds $550,000. (*See* 3:16-cr-00073-JBA-1 [Doc. # 485].)

Even assuming *arguendo* that Petitioner is correct, and he could have established lower loss values for seven of the cars under Application Note 3(E)(ii), the total value of the eleven title-washed cars for which he is liable is still more than $550,000.

| Cars Defendant contested liability for: | Adjusted Loss Value (Intended Loss – Repossession Value) |
|---|---|
| 2013 BMW convertible (128i) | $21,500.00 |
| BMW 750Li Xdrive | $0 |
| 2008 Hummer | $12,362.00 |
| 204 Jeep Cherokee | $32,102.00 |
| Total for four contested cars: | $65,964.00 + |
| Defendant's proposed seven-car total: | $205,230.67 |
| Eleven car total: | $271,194.67 + |
| Amount of Postal Order Fraud: | $313,570.00 |
| **Total of Title-Washing and Postal Order Fraud with Credits Deducted:** | $584,764.67 |

(*See* 3:16-cr-00073-JBA-2, *Fatico* Day 1 Tr. at 118, 123, 132-133; 16-cr-00073-JBA-2, *Fatico* Day 2 Tr. at 22-23.) As seen above, the resulting figure still exceeds $550,000.

Because the amount of loss would still have resulted in an increase of 14 Guideline levels regardless of whether his counsel had requested a *Fatico* hearing in connection with his sentencing, Petitioner cannot show that he suffered prejudice from his counsel's decision not to request a *Fatico* hearing. Petitioner's motion for a resentencing for the failure to request a *Fatico* hearing is DENIED.

## IV.    Conclusion

For the foregoing reasons, the Court DENIES Petitioner's motion [Doc. #1].

IT IS SO ORDERED.

___/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut:  September 19, 2022